On Application for Rehearing and On Return to Second Remand

PER CURIAM.
The opinion issued on December 20, 2013, is withdrawn and the following opinion is substituted therefor.
The appellant, Howard Carl Whited, was convicted of sodomy in the first degree, a violation of § 13A-6-63, Ala.Code 1975. The circuit court sentenced Whited to 35 years’ imprisonment and ordered Whited to pay $50 to the Alabama Crime Victims Compensation Fund and court costs.
The evidence presented at trial established the following pertinent facts. In May 2005, when M.H. was 14 years old, she lived with her father in an apartment complex in Allgood. Danny Robertson lived next to M.H. and her father. Robertson testified that he had observed Whited at M.H.’s father’s apartment approximately two to three times per week. Robertson stated that he could hear conversations and noise coming from M.H.’s apartment, and, specifically, on the evening of May 19, 2005, Robertson went to take a shower and could hear M.H. saying “Stop. Don’t. No more, please.” Robertson stated that, in addition to M.H.’s voice, he could hear three male voices. Robertson stated that after he got out of the shower he could hear M.H. “crying— weeping on the floor.” (R. 38.) Robertson stated that there had been “[qjuite a few” incidents similar to this and that on those occasions he would see Whited at the apartment. After Robertson heard M.H. “crying — weeping on the floor” he reported what he had heard to the Blount County Sheriffs Office the following morning.
M.H. testified that in 2005 Whited and another male — Edward Dunn — would visit her father and that Whited would be at her house “[ejvery now and then.” (R. 74.)
M.H. stated that one morning in February 2005, she woke up at approximately 6:00 a.m. and heard someone knocking on the front door. M.H. stated that she answered the door and saw Whited. M.H. testified that Whited asked whether M.H.’s father was home and she went and checked. When M.H. returned to the door to tell Whited that her father was not home, Whited came into the apartment and shut the door and gave her two pieces of gum. M.H. stated that she turned around and placed one piece of gum on the washing machine and Whited grabbed her around the waist and started kissing her neck. M.H. stated that Whited then “started talking to [her] telling [her] that he knows that [she] thinkfs] about him a lot and that [she] dream[s] about him.” (R. 76-77.) M.H. stated that she told Whited that she did not “think like that” and told him that she “needed to get ready for school and that he needed to get ready *53 to go to work and he needed to leave.” (R. 77.) M.H. stated that Whited then told her that “everybody has got to grow up sometime” and that “if [she] ever changed [her] mind, [she] could call him.” (R. 77.) M.H. stated that after Whited left she began crying because she “couldn’t believe what had just happened.” (R. 77.) M.H. stated that when she got to school she told the school nurse what had happened.
M.H. further testified that in May 2005 she came home from school and Whited, Dunn, and her father were sitting on the couch “laughing and smoking pot.” According to M.H., “they were looking at [her] weird” so she decided to go to her room. M.H. stated that she could hear the three men when she was in her room and that she stayed in her room until she got up to get something to drink. M.H. stated that she then got ready for bed but could not fall asleep because the three men were too loud. M.H. stated that, at some point, the bedroom door opened and Whited, Dunn, and her father entered the bedroom. M.H. stated, however, that “[i]t was dark” in the bedroom and that she “couldn’t see their faces.” (R. 81.) M.H. stated that Whited then came toward her and “grabbed [her] by the leg and he pulled [her] long ways on [her] bed over to [her] dad’s bed.” (R. 83.) M.H. stated that Whited then “took [her] panties off’ and “got on top of [her] and then he stuck his penis in [her] back side and then somebody took an electric toothbrush and he stuck it inside [her].” (R. 83.) M.H. stated that Whited then “took a back massager and rubbed it on [her] back and all over. He got off [her] and someone else got on [her].” (R. 83.) M.H. stated that while this was happening she was on her stomach and that if she tried to get up “somebody would hit [her] on the back of the head.” (R. 84.) M.H. further testified that, at some point, “[t]hey got off and [Whited] said if [she] told anybody, that he would kill [her].” (R. 85.)
After M.H. testified, the State rested and Whited moved for a judgment of acquittal, which the circuit court denied. Whited then presented evidence that tended to establish the following: Jeffrey Wfiiited (“Jeffrey”) testified that he is Wfiiited’s uncle and that on May 19, 2005, he visited with Whited, at approximately 6:30 p.m. at Jeffrey’s mother’s house in Oneonta. Jeffrey stated that he remembered visiting with Whited on that date because he wrote it down in his journal, which, he said, he keeps for work. Jeffrey stated that Whited was at the house when he arrived and that Whited told Jeffrey that his back hurt. According to Jeffrey, Whited “looked rough.” Jeffrey stated that he stayed at the house until approximately 9:00 p.m. and that Whited did not leave.
' Deputy Sue Ashworth testified that she investigates sexual crimes for the Blount County Sheriffs Office. Ashworth testified that on May 26, 2005, she went to M.H.’s father’s apartment, because she had received a complaint from Robertson about possible sexual abuse. Deputy Ashworth stated that on May 26, 2005, M.H. stated that “her father had put his penis in her butt” (R. 153) and that Whited and another person were involved as well. Deputy Ashworth also testified, however, that M.H. stated that she could not see their faces. Deputy Ashworth testified that during the interview she did not notice any marks on M.H. to indicate physical abuse. According to Deputy Ashworth, M.H., during a videotaped interview, stated that she was “penetrated vaginally” by both her father and Whited. (R. 156.) Deputy Ashworth testified that, at some point, she executed a search warrant on M.H.’s father’s apartment and seized sheets, bedding, toothbrushes, and *54 a massager for the. purpose of having those items tested at the Department of Forensic Sciences (“DFS”). Deputy Ash-worth testified that she received a report from DFS indicating that they were unable to locate any DNA evidence on the items. Deputy Ashworth further testified that M.H. received a medical examination that indicated that she had contracted ureaplasma urealyticum — a sexually transmitted disease. Deputy Ashworth stated that Whited was tested for the sexually transmitted disease and that his test result was negative. Deputy Ashworth testified, however, that Edward Dunn tested positive for ureaplasma urealyticum. Deputy Ashworth stated that, in July 2005, she interviewed Whited and Whited denied any involvement with the offense.
On crossr-examination, Deputy Ashworth stated that M.H. told her that, before May 19, 2005, M.H. had been molested by her father for a long period (R. 182) and, on those occasions, would scream for her father to stop.
Brad Sims, a child-abuse-and-neglect investigator for the Department of Human Resources, testified that he and Deputy Ashworth met with M.H. in May 2005. According to Sims, M.H. did not tell them what occurred on May 19, 2005, but only stated that she had been molested by her father. Sims stated that at that time there was no indication that anyone but M.H.’s father was involved. Sims testified that on June 15, 2005, he and Deputy Ashworth again met with- M.H. and that, during that meeting, M.H. for the first time mentioned both Whited and Dunn. When confronted with his report of that meeting, however, Sims agreed that the report did not mention Whited or Dunn and stated only that “[M.H.] told us again that she had -been molested by her father. She indicated that he had anal sex with her in the bedroom they shared.” (R. 232.)
On cross-examination, Sims testified that he had investigated Whited in February 2005, because M.H. had alleged that Whited had come to her father’s apartment and kissed her on the neck and also mentioned to M.H. that he had been having dreams about engaging in sexual intercourse with her. • Sims stated that, although Whited did not deny going to the apartment, he denied any wrongdoing. Sims conceded that no charges were brought against Whited arising out of the events that M.H. alleged occurred in February 2005.
Huían Whited (“Huían”), Whited’s father, testified' that on May 19, 2005, he and Whited were
“over at Mr. Owen’s house. His lawnmower had broke down with .him. He had to get a part for it — had to go to Cleveland. We had to mow Ms. Turley’s yard. We worked on it until noon and got us a sandwich and went over there and mowed her yard. [Whited] hurt his back. We got home and he was in the bed a week.”
(R. 236.) Huían further testified that on May 19, 2005, Jeffrey came over to the house at approximately 6:00 p.m. and remained at the house until approximately 9:30 p.m. According to Huían, Whited was at the house the entire evening because Whited hurt, his back and was unable to leave.
Daniel Stidham testified that in May 2005, he was employed by Mutual Savings Life Insurance and that Whited was one of his customers. According to Stidham, on May 19, 2005, he ■
“and his sales manager [were] working Springville Boulevard. That was his first week of employment. We had went down to Glenda Torbert’s on Woodard Road, and as we were coming back up, as we approached Ms. Turley’s driveway and the edge of her lawn here, my sales *55 manager had me to slow down and stop. He waved at [Whited] and his father.”
(R. 240.) Stidham testified'that he did not know who Whited was at the time and was only able to recall that he saw Whited on May 19, 2005, because he had a “copy of [his] mandate” (R. 241), which he kept for work.
Whited testified in his own behalf, and, although he conceded that he knew M.H., he denied that he had anything to do with ■ the events of May 19, 2005. Whited stated that he knew M.H.’s father because they had gone to school together and that in February 2005 he was going to work and noticed that the hood on M.H.’s father’s car was raised. Whited stated that he then went over to M.H.’s father’s apartment to see if he needed a ride to work. Whited stated that M.H. answered the door and indicated that her father was not home. According to Whited, he never entered the apartment and, after M.H. stated that her father was not home, he left the apartment and never returned.
Whited stated that on May 19, 2005, he was working with his father and his great uncle, Cecil Owen. According to Whited, they repaired a lawnmower that morning and around 12:00 p.m. went to Ms. Tur-ley’s home to cut her lawn. Whited stated that it took approximately two and a half hours to cut Ms. Turley’s lawn and they left Ms. Turley’s home at approximately 3:00 p.m. Whited stated that, at some point that day, he strained a muscle in his back “around where [he] had surgery.”[1]' (R. 251.) Whited further testified that he did not have any sexually transmitted diseases.
At the close of Whited’s evidence, Whited again moved for a judgment of acquittal, which the circuit court denied. The State then presented its closing argument; Whited waived his closing argument; and the circuit court charged the jury. The jury returned a verdict of guilty of first-degree sodomy. On August 31, 2009, Whited filed a motion for a new trial and on December 14, 2009,[2] filed an amended motion for a new trial, in which he raised numerous ineffective-assistance-of-counsel claims. After a continuance by agreement of the parties, see Rule 24.4, Ala. R.Crim. P., the circuit court, on January 28, 2010, conducted a hearing on Whited’s motion. On February 16, 2010, the circuit court denied Whited’s motion and made the following entry on the case-action-summary sheet: “The court having considered testimony of witnesses and argument of counsel, [Whited’s] motion for [a] new trial is hereby denied.” (C. 20.) This appeal followed.[3]
“Whited contends that the circuit court erred in denying his motion for a new trial on the ground that his trial counsel was ineffective. Specifically, Whited contends that his trial counsel was ineffective because, he says, (1) his trial counsel was deficient in “examining witnesses, offering evidence, and failing to object to inadmissible evidence of numerous incriminating statements made by [M.H.] ” and (2) his *56 trial counsel faded to make a closing argument. (Whited’s brief, p. 6.) Whited also contends that this Court should consider the cumulative effect of the ineffective-assistance-of-counsel claims when assessing, whether his counsel’s performance was deficient.
This Court’s review of a • trial court’s ruling on a motion for a new trial is limited:
“ ‘ “ ‘It is well established that a ruling on a motion for a new trial rests within the sound discretion of the trial judge. The exercise of that discretion carries with it a presumption of correctness, which will not be disturbed by this Court unless some legal right is abused and the record plainly and palpably shows the trial judge to be in error.’ ” ’ Hosea O. Weaver & Sons, Inc. v. Towner, 663 So.2d 892, 895 (Ala.1995) (quoting Kane v. Edward J. Woerner & Sons, Inc., 543 So.2d 693, 694 (Ala.1989), quoting in turn Hill v. Sherwood, 488 So.2d 1357 (Ala.1986)).”
Ex parte Hall, 863 So.2d 1079, 1081-82 (Ala.2003).
“ ‘ “In order to prevail on a claim of ineffective assistance of counsel, a defendant must meet the two-pronged test articulated by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984):
“1 “ ‘First, the defendant must show that counsel’s performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the “counsel” guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel’s errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.’
“ ‘ “466 U.S. at 687, 104 S.Ct. at 2064.
“ ‘ “ ‘The performance component outlined in Strickland is an objective one: that is, whether counsel’s assistance, judged under “prevailing professional norms,” was “reasonable considering all the circumstances.”’ Daniels v. State, 650 So.2d 544, 552 (Ala.Cr.App.1994), cert. denied, [514 U.S. 1024,115 S.Ct. 1375,131 L.Ed.2d 230 (1995)], quoting Strickland, 466 U.S. at 688, 104 S.Ct. at 2065. ‘A court deciding an actual ineffectiveness claim must judge the reasonableness of counsel’s challenged conduct on the facts of the particular case, viewed as of the time of counsel’s conduct.’ Strickland, 466 U.S. at 690, 104 S.Ct. at 2066.
“ ‘ “The claimant alleging ineffective assistance of counsel has the burden of showing that counsel’s assistance was ineffective. Ex parte Baldwin, 456 So.2d 129 (Ala.1984), aff'd, 472 U.S. 372, 105 S.Ct. 2727, 86 L.Ed.2d 300 (1985). ‘Once a petitioner has identified the specific acts or omissions that he alleges were not the result of reasonable professional judgment on counsel’s part, the court must determine whether those acts or omissions fall “outside the wide range of professionally competent assistance.” [Strickland,] 466 U.S. at 690,104 S.Ct. at 2066.’ Daniels, 650 So.2d at 552. When reviewing a claim of ineffective assistance of counsel, this court indulges a strong presumption that counsel’s conduct was appropriate and reasonable. Hallford v. State, 629 *57 So.2d 6 (Ala.Cr.App.1992), cert. denied, 511 U.S. 1100, 114 S.Ct. 1870, 128 L.Ed.2d 491 (1994); Luke v. State, 484 So.2d 531 (Ala.Cr.App.1985). ‘This court must avoid using “hindsight” to evaluate the performance of counsel. We must evaluate all the circumstances surrounding the case at the time of counsel’s actions before determining whether counsel rendered ineffective assistance.’ Hallford, 629 So.2d at 9. See also, e.g., Cartwright v. State, 645 So.2d 326 (Ala.Cr.App.1994).
“ ‘ “ ‘Judicial scrutiny of counsel’s performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel’s assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel’s defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel’s challenged conduct, and to evaluate the conduct from counsel’s perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel’s conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action “might be considered sound trial strategy.” There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.’
‘““Strickland, 466 U.S. at 689, 104 S.Ct. at 2065 (citations omitted). See Ex parte Lawley, 512 So.2d 1370, 1372 (Ala.1987).
“ ‘ “ ‘Even if an attorney’s performance is determined to be deficient, the petitioner is not entitled to relief unless he establishes that “there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.” [Strickland>] 466 U.S. at 694,104 S.Ct. at 2068.’
“ ‘ “Daniels, 650 So.2d at 552.” ’
“Dobyne v. State, 805 So.2d 733, 742-43 (Ala.Crim.App.2000), aff'd, 805 So.2d 763 (Ala.2001). See also Nicks v. State, 783 So.2d 895, 918-919 (Ala.Crim.App.1999).”
Sheffield v. State, 87 So.3d 607, 633-35 (Ala.Crim.App.2010). With these principles in mind we turn to Whited’s specific claims of ineffective assistance of counsel.
I.
Whited first contends that his trial counsel was ineffective because, he says, his trial counsel was deficient in examining witnesses, offering evidence, and failing to object to inadmissible evidence. Specifically, Whited contends that trial counsel’s “deficient cross-examination of M.H. and [counsel’s] deficient direct examination of his own witnesses, Deputy Sue Ashworth and Investigator Brad Sims, repeatedly placed before the jury the otherwise inadmissible statements of M.H. that incriminated Howard Whited.” (Whited’s brief, p. 62.) Whited also contends that trial counsel’s decision to offer into evidence as defense exhibits a DFS evidence submission form prepared by Deputy Ashworth and a medical report prepared by M.H.’s *58 doctor resulted in the admission of incriminating evidence that prejudiced him at trial.
In its amended order denying Whited’s motion for a new trial, the circuit court addressed Whited’s challenge to his trial counsel’s performance finding, in pertinent part, as follows:
“As to the allegation [that trial counsel elicited inadmissible testimony from witnesses called by the State and from witnesses called on behalf of Whited,] the Court finds that counsel for [Whited] did in fact elicit testimony from witnesses Deputy Sue Ashworth, [Department of Human Resources] Investigator Brad Sims, ■ and the victim which was inadmissible hearsay. And the said testimony to which appellate counsel referred in the Amended Motion for a New Trial was not favorable to [Whited].
“As to the allegation [that trial counsel failed to object to inadmissible and prejudicial testimony from witnesses called by the state and from,witnesses called on behalf of Whited,] the Court finds that counsel for [Whited] did not object when the State asked questions of witnesses Ashworth, Sims, the victim and [Whited] which called for testimony which could have been objected to on the basis of hearsay, relevancy and/or as testimony violative of the -exclusionary rule. And the said testimony to which appellate- counsel referred in the Amended Motion for a New Trial was not favorable to [Whited].
“As to the allegation [that trial counsel offered as his own exhibits two inadmissible documents that largely consisted of inadmissible hearsay that tended to incriminate Whited,] the Court finds that counsel for [Whited] did in .fact offer as exhibits (1) the. Alabama Department of Forensic Sciences Evidence Submission Form which was filled 'out by Deputy Ashworth, and (2) the report of Dr. Stradtman. Both of these exhibits contain hearsay, and some of the hearsay contained in the exhibits is not favorable to [Whited].
“However, these exhibits allowed defense counsel to show that the reports do not mention any vaginal penetration which was contrary to what the victim testified to on direct examination, and called into question the veracity of her testimony. In particular, the report from Dr. Stradtman showed that the victim had not told about any vaginal penetration. Also, the Alabama Department of Forensic Sciences Evidence Submission Form shows that there were several items collected from the victim’s home which could have been, but were not, tested for DNA. Additionally, the report from -Dr. Stradtman shows that the victim had a venereal disease and it was undisputed that the defendant did not have the disease.
[[Image here]]
“As to the allegation [that trial counsel’s own questions elicited from State witness [M.H.] was repetitious, incriminating and prejudicial,] the Court finds that counsel for [Whited] did, in fact elicit from the victim testimony which was inculpatory and repetitious.
“However, the testimony referred to [above] was essentially the same testimony that the victim had testified to during direct examination by the prosecution. And while it is true that the testimony was generally not favorable to [Whited], some of the testimony showed inconsistencies in what the victim had stated to the different investigators.
“The Court- does not find that the actions of defense counsel caused any substantial disadvantage to the court of the defense put forth by defense counsel. The Court does not find that coun *59 sel’s conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result. And the court does not find that the claims [set forth above] warrant setting aside the judgment of the jury and granting a new trial.”
(Record on return, to second remand, C. 3-4.)
The record indicates that in his opening statement at trial, trial counsel stated that he expected ■ to show inconsistencies in M.H.’s version of events. To that end, trial counsel cross-examined M.H, at length regarding her version of the events in February 2005 and May 2005 and the veracity of her allegations against-Whited. Counsel further established during cross-examination that it was dark during the May 2005 incident, that M.H. could not see her perpetrators’ faces, and that Whited did not have the sexually transmitted disease M.H. tested positive for following the May 2005 incident.
The- record indicates that trial counsel’s decision to call Deputy Ashworth and Sims to testify as defense witnesses was strategic in nature. At the hearing on Whited’s motion for a new trial, trial counsel testified that he called Deputy Ashworth as a witness regarding M.H.’s allegation that Whited raped her and to emphasize that M.H. was unable to visually identify her perpetrators. During his examination of Deputy Ashworth, trial counsel established that there was no DNA evidence recovered from the scene that identified Whited as one of. the perpetrators, that Whited tested negative for a sexually transmitted disease, and that M.H. had no visible bruises despite her claim that she was hit several times during the May 2005 incident. Trial counsel explained that he called Sims as a witness for Sims to confirm that M.H. did not allege that Whited sodomized her or vaginally penetrated her during the initial interview, thereby attacking the veracity of M.H. and Deputy Ashworth’s testimony. Further, trial counsel confirmed through Sims that there was no evidence of vaginal penetration during M.H.’s physical examination.
Regarding trial counsel’s decision to submit the evidence-submission form and the doctor’s report into evidence at trial, the record indicates that counsel offered into evidence the evidence-submission form to establish what items were taken’ from M.H.’s apartment for forensic testing and to confirm that all items taken from the apartment' tested negative for DNÁ, semen, or any other physical evidence that could implicate Whited. The record further indicates that counsel submitted the doctor’s report as evidence to attack the veracity of M.H.’s testimony and to support Whited’s defense theory. The report prepared by Dr. Stradtman following M.H.’s physical examination included a transcript of the doctor’s interview with M.H. during which she denied that any perpetrator had vaginally penetrated her. The report further indicated that Dr. Stradtman did not see evidence of a tear to M.H.’s hymen and that M.H. tested positive, in her vagina and rectum for the sexually transmitted-disease urea-plasma. •
In addressing a claim that trial counsel “was ineffective for failing to effectively cross-examine several state witnesses” we have explained:
“ ‘ “[Decisions regarding whether and how to conduct cross-examinations and what evidence to introduce are matters of trial strategy and tactics.” Rose v. State, 258 Ga.App. 232, 236, 573 S.E.2d 465, 469 (2002). “ ‘ “[Decisions whether to engage in cross-examination, and if so *60 to what extent and in what manner, are ... strategic in nature.” ’ ” Hunt v. State, 940 So.2d 1041, 1065 (Ala.Crim.App.2005), quoting Rosario-Dominguez v. United States, 353 F.Supp.2d 500, 515 (S.D.N.Y.2005), quoting in turn, United States v. Nersesian, 824 F.2d 1294, 1321 (2d Cir.1987). “The decision whether to cross-examine a witness is [a] matter of trial strategy.” People v. Leeper, 317 Ill.App.3d 475, 483, 740 N.E.2d 32, 39, 251 Ill.Dec. 202, 209 (2000).’ ”
Bush v. State, 92 So.3d 121, 155 (Ala.Crim.App.2009) (quoting A. G. v. State, 989 So.2d 1167, 1173 (Ala.Crim.App.2007)). Furthermore,
“ ‘[t]he decision [to call or] not to call a particular witness is usually a tactical decision not constituting ineffective assistance of counsel.’ Oliver v. State, 435 So.2d 207, 208-09 (Ala.Crim.App.1983). ‘ “ ‘This Court will not second-guess tactical decisions of counsel in deciding whether to call certain witnesses.’ United States v. Long, 674 F.2d 848, 855 (11th Cir.1982).” Oliver v. State, 435 So.2d 207, 208-09 (Ala.Cr.App.1983).’ Falkner v. State, 462 So.2d 1040, 1041-42 (Ala.Crim.App.1984).”
Sheffield, 87 So.3d at 640.
In the instant case, the choices made by trial counsel in cross-examining M.H., in calling Deputy. Ashworth and Sims to testify, and in moving to admit the evidence-submission form and doctor’s report into evidence at trial were strategic in nature and exactly the kind of choices contemplated by well settled caselaw giving deference to strategic decisions made by counsel at trial. See Sheffield, supra; see also McGahee v. State, 885 So.2d 191, 222 (Ala.Crim.App.2003) (holding strategic decisions of trial counsel “are virtually unassailable”). Accordingly, the circuit court did not abuse its discretion in denying Whited’s motion for a new trial on the basis that Whited’s counsel had rendered ineffective assistance based on counsel’s alleged deficient performance in examining witnesses, in offering evidence, and in failing to object to inadmissible evidence.
II.
Whited also contends that his trial counsel was ineffective because counsel waived closing argument at trial. Specifically, Whited alleges that “[t]he primary opportunity to explain the evidence ... to the jury occurs when counsel makes his closing argument at the end of the case[, and that] [t]he gravest shortcoming in [Whited’s trial counsel’s] representation of [Whited] — the principal error that most prejudiced [Whited]— ... was [his trial counsel’s] failure to make a closing argument.” (Whited’s brief, p. 76.)
In addressing Whited’s contention in his motion for a new trial that counsel rendered ineffective assistance by waiving closing argument, the circuit made the following findings of fact:
“[T]he Court finds that counsel for [Whited] did in fact waive the right to offer a closing argument to the jury. During the hearing on the motion for a new trial, trial counsel for [Whited] stated it was trial strategy in not offering a closing and to prevent the prosecution from further commenting on [Whited’s] conduct.
“It is this Court’s understanding that the law requires the Court give deference to trial counsel’s decisions and strategic choices. And it is the Court’s opinion that the waiver of a closing argument did not affect the outcome of the verdict. As such, the Court does not find that counsel’s conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result. And the Court does not find that *61 [counsel’s failure to make a closing argument] warrants setting aside the judgment of the jury and granting a new trial.”
(Record on return to second remand, C. 5-6.)
The record indicates that, at the hearing on Whited’s motion for new trial, trial counsel testified that his decision to waive closing argument was trial strategy. When asked specific questions regarding his strategic decisions, however, trial counsel testified that his recollection of the events surrounding Whited’s case was diminished based on the sudden death of his wife less than two months after Whited’s trial. Trial counsel testified that he could not recall when he made the decision to waive his closing argument but stated generally that the decision whether to have a closing argument is “part of the attorney’s strategy.” (R. 349.)
“ ‘If the record is silent as to the reasoning behind counsel’s actions, the presumption of effectiveness is sufficient to deny relief on [an] ineffective assistance of counsel claim.’” Davis v. State, 9 So.3d 539, 546 (Ala.Crim.App.2008)(quoting Howard v. State, 239 S.W.3d 359, 367 (Tex.Crim.App.2007)).
“ ‘ “An ambiguous or silent record is not sufficient to disprove the strong and continuing presumption [of effective representation]. Therefore “where the record is incomplete or unclear about [counsel]’s actions, we will presume that he did what he should have done, and that he exercised reasonable professional judgment.’” Chandler v. United States, 218 F.3d 1305, 1314 n. 15 (11th Cir.2000) (en banc) (quoting Williams v. Head, 185 F.3d 1223, 1228 (11th Cir.1999)).’ ”
Davis, 9 So.3d at 546 (quoting Grayson v. Thompson, 257 F.3d 1194, 1218 (11th Cir.2001)). Trial counsel’s inability to recall the basis of his strategic decision to waive closing argument in this case limits this Court’s ability to review •counsel’s representation at trial.
Not only are we limited in our review by trial counsel’s inability to recall the basis of his strategic choice to waive closing argument, we are also limited in our review by the United States Supreme Court’s holding in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In Strickland, the United States Supreme Court cautioned that a court must indulge a “strong presumption” that counsel’s conduct falls within the wide range of reasonable professional assistance because it is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight. 466 U.S. at 689. Furthermore, “it is not our. function to second-guess the strategic decisions made by counsel.” Smith v. State, 756 So.2d 892, 910 (Ala.Crim.App.1997), aff'd, 756 So.2d 957 (Ala.2000). Indeed, a review of the prosecutor’s closing argument indicates that the prosecutor made an emotional plea to the jury that included general statements about the hideous nature of the offenses of which Whited had been charged and the plight of the victim following the incident. It is possible that trial counsel made a strategic choice to waive closing argument in order to prevent the prosecutor from returning on rebuttal and going into specific detail regarding the evidence presented at trial. It is this type of decision that the Supreme Court contemplated in Strickland when it recognized the presumption in favor of a finding - of reasonable professional assistance when the challenged action “might be considered sound trial strategy.” 466 U.S. at 689.
It is well settled that a trial counsel’s decision to waive closing argument is *62 ■not, in itself, ineffective assistance of counsel. See Young v. State, 887 So.2d 320 (Ala.Crim.App.2004) (holding that “ ‘waiver of closing argument, without more, does not constitute ineffective assistance of counsel’”); Lawhorn v. State, 756 So.2d 971 (Ala.Crim.App.1999) (holding that trial counsel was not ineffective for making a strategic decision to waive penalty-phase closing argument in order “to deprive the prosecution of labeling Lawhorn a ‘coldblooded murderer and' back-shooter’ ”); Floyd v. State, 571 So.2d 1221 (Ala.Crim.App.1989) (holding that trial counsel was not ineffective for making a strategic decision to waive closing argument “in order to deprive the prosecution of its main opportunity to argue its case to the jury”), rev’d on other grounds, 571 So.2d 1234 (Ala.1990); Behel v. State, 405 So.2d 51 (Ala.Crim.App.1981) (holding that even if trial counsel’s “failure to make a closing argument is ultimately viewed as a mistake unfavorable to his client, that alone is not sufficient to demonstrate inadequate representation”).
Although Whited makes a compelling argument that his trial counsel exercised poor judgment in waiving closing argument, Whited failed to “affirmatively prove prejudice” and “show that there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different.” Strickland, 466 U.S. at 694. “The prejudice prong of the Strickland test requires a showing that a different outcome of the trial probably would have resulted but for counsel’s allegedly ineffective performance.” Worthington v. State, 652 So.2d 790, 796 (Ala.Crim.App.1994)(internal citations omitted). Whited has not made such a showing in this case. Accordingly, the circuit court did not abuse its discretion in denying Whited’s motion for a new trial on the basis that- he received ineffective assistance of counsel based on counsel’s waiver of closing argument.
III.
Finally, Whited contends that “[t]he many deficiencies in [trial counsel’s] overall performance, considered together, render it unfathomable” that Whited’s trial produced a just result under Strickland. (Whited’s brief, p. 58.) Whited contends that .the. facts of his case should “serve as the vehicle for the express adoption by this Court of the cumulative error doctrine as applicable in ineffective-assistance-of-counsel claims.” (Whited’s brief, p. 58.)
'In Brooks v. State, 929 So.2d 491 (Ala. Crim.App.2005), this Court addressed the application of the cumulative-error doctrine in ineffective-assistance claims:
“Other states and federal courts are not in agreement as to whether the ‘cumulative effect’ analysis applies to Strickland claims. As the Supreme Court of North Dakota noted in Garcia v. State, 678 N.W.2d 568, 578 (N.D.2004):
“‘Garcia argues that even if trial counsel’s individual acts or-omissions are insufficient' to establish he was prejudiced, the cumulative effect was substantial enough to meet Strickland’s test. See Williams v. Washington, 59 F.3d 673, 682 (7th Cir.1995) (“In making this showing, a petitioner may demonstrate that the cumulative effect of counsel’s individual acts or omissions was substantial enough to meet Strickland ⅛ test”); but see Scott v. Jones, 915 F.2d 1188, 1191 (8th Cir.1990) (“cumulative error does not call for habeas relief, as each ha-beas claim must stand or fall on its own”).’
“See also Holland v. State, 250 Ga.App. 24, 28, 550 S.E.2d 433, 437 (2001)(‘Be-eause the so-called cumulative error doc *63 trine is inapplicable, each claim of inadequacy must be examined independently of other claims, using the two-prong standard of Strickland v. Washington.’ (footnote omitted)); Carl v. State, 234 Ga.App. 61, 65, 506 S.E.2d 207, 212 (1998)(‘Georgia does not recognize the cumulative error rule.’); Fisher v. Angelone, 163 F.3d 835, 852 (4th Cir.1998)(‘Not surprisingly, it has long been the practice of this Court to individually assess claims under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). See, e.g., Hoots v. Allsbrook, 785 F.2d 1214, 1219 (4th Cir.1986)(eonsidering ineffective assistance claims individually rather than considering their cumulative impact.).’).
“We can find no case where Alabama appellate courts have applied the cumulative-effect analysis to claim's of ineffective assistance of counsel. However, the Alabama Supreme Court has held that the' cumulative effect of prosecutorial ■misconduct necessitated a new trial in Ex parte Tomlin, 540 So.2d 668, 672 (Ala.1988)(‘We need not decide whether either of the two errors, standing alone, would require a reversal; we hold that the cumulative effect of the errors probably adversely affected the substantial rights of the defendant and seriously affected the fairness and integrity of the judicial proceedings.’). Also, in Ex parte Bryant, [951 So.2d 724 (Ala.2002)], the Supreme Court held that the cumulative effect of errors may require reversal.
“If we were to evaluate the cumulative effect of the ineffective assistance of counsel claims, we would find that Brooks’s substantial rights were not injuriously affected. See Bryant and Rule 45, Ala. R.App. P.”
Brooks, 929 So.2d at 514.
In the instant case, the circuit court noted deficiencies in counsel’s performance at trial, but held that those deficiencies did not undermine the adversarial process so as to produce an unjust result. Even if we were to evaluate the errors made by trial counsel as a whole, we would conclude, as the circuit court did below, that the errors did not affect the fairness and integrity of the‘judicial proceedings. See Brooks, supra. Therefore, we affirm as to this issue.
For the foregoing reasons, we affirm the circuit court’s judgment denying Whited’s motion for a new trial alleging he received ineffective assistance of counsel at trial.
APPLICATION FOR REHEARING OVERRULED; OPINION OF DECEMBER 20, 2013, WITHDRAWN; OPINION SUBSTITUTED; AFFIRMED.
WINDOM, P.J., and WELCH and KELLUM, JJ., concur.
JOINER, J., dissents, with opinion, which BURKE, J., joins.

. According to Whited, in 1999 he injured the "seven, eight, and nine thoracic spine and went paralyzed.” (R. 252.) As a result, Whited had to undergo surgery.

. Whited was sentenced on November 19, 2009. (C. 14.)

. On October 22, 2010, this Court remanded this case to the circuit court for that court to make specific, written findings of fact as to éach of Whited's allegations in his motion for a new trial. On January 20, 2011, return was made to. this Court, On February 1, 2012, this Court again remanded this case to the circuit court for that court to make specific, written findings of fact as to each of Whited’s allegations in his motion for a new-trial. On May 3, 2012, return was made to this Court.