BOLIN, Justice.
Howard Carl Whited was convicted of sodomy in the first degree, a violation of § 13A-6-63, Ala.Code 1975. The ' trial court sentenced Whited to 35 years’ imprisonment and ordered Whited to pay $50 to the Alabama Crime Victims Compensation Fund and court costs. The Court of Criminal Appeals affirmed Whited’s conviction and sentence in a 3-2 per curiam opinion. Whited v. State, 180 So.3d 49 (Ala.Crim.App.2014). Whited petitioned this Court for a writ of certiorari, contending that the decision of the Court of Criminal Appeals conflicts with. Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). We granted the petition, and we reverse and remand.

Facts and Procedural History

The Court of Criminal Appeals set forth the following facts:
“In- May 2005, when M.H. was 14 years old, she lived with her. father in an apartment complex in Allgood. Danny Robertson lived next to M.H. and her father. Robertson testified that he had observed Whited at M.H.’s father’s apartment approximately two to three times per week. Robertson stated that he could hear conversations and noise coming from M.H.’s apartment, and, specifically, on the evening of May 19, 2005, Robertson went to take a shower and could hear M.H. saying ‘Stop. Don’t. No more, please.’ Robertson stated that, in addition t.o M.H.’s voice, he could hear three male voices. Robertson stated that after he got out of the shower he could hear M.H.. ‘crying — weeping on •the floor.’ Robertson, stated that there had been ‘[q]uite a few’ incidents similar to this and that on those occasions he would see Whited at the apartment. After Robertson heard M.H. ‘crying— weeping on the floor’ he reported what he had heard to the Blount County Sheriff’s Office the following morning.
“M.H. testified that in 2005 Whited and another' male — Edward ' Dunn— would visit her father and that Whited would be at her house ‘[ejvery now and then.’
“M.H. stated that one morning in February 2005, she woke up at approximately 6:00 a.m. and heard someone knocking on the front door. M.H. stated that she answered the door and saw Whited. M.H. testified that Whited asked whether M.H.’s father was home and she went and checked. When M.H. returned to the door to tell Whited that her father was not home, Whited came into the apartment and shut the door and gave her two pieces of gum. M.H. stated that she turned around and placed one piece of gum on the washing machine and Whited grabbed her around the waist and started kissing her neck. M.H. stated that Whited then ‘started talking to [her] telling [her] that he knows that [she] think[s] about him a lot and that [she] dr'eam[s] about him.’ M.H. stated that .she told Whited that she did not ‘think like that’ and told him that she ‘needed to get ready for school and that he needed to get ready to go to ;..work and he needed, to leave.’ M,H. stated that Whited then told her, that ‘everybody has got to grow up sometime’ and that ‘if. [she] ever changed [her] mind, [she] could call him.’ M.H. stated that after Whited left she began crying because she ‘couldn’t believe what had just happened.’ M.H. stated that when she got to school she told the school nurse what had happened.
*72 “M.H. further testified that in May 2005 she came home from school and Whited, [Edward] Dunn, and her father were sitting on the couch ‘laughing and smoking pot.’ According to M.H., ‘they were looking at [her] weird’ so she decided to go to her room. M.H. stated that she could hear the three men when she was in her room and that she stayed in her room until she got up to get something to drink. M.H. stated that she then got ready for bed but could not fall asleep because the three men were too loud. M.H. stated that, at some point, the bedroom door opened and Whited, Dunn, and her father entered the bedroom. M.H. stated, however, that ‘[i]t was dark’ in the bedroom and that she ‘couldn’t see their faces.’ M.H. stated that Whited then came toward her and ‘grabbed [her] by the leg and he pulled [her] long ways on [her] bed over to [her] dad’s bed.’ M.H. stated that Whited then ‘took [her] panties off and ‘got on top of [her] and then he stuck his penis in [her] back side and then somebody took an electric toothbrush and he stuck it inside [her].’ M.H. stated that Whited then ‘took a back massager and rubbed it on [her] back and all over. He got off [her] and someone else got on [her].’ M.H. stated that while this was happening she was on her stomach and that if she tried to get up ‘somebody would hit [her] on the back of the head.’ M.H. further testified that, at some point, ‘[t]hey got off and [Whited] said if [she] told anybody, that he would kill [her].’
“After M.H. testified, the State rested and Whited moved for a judgment of acquittal, which the circuit court denied. Whited then presented evidence that tended to establish the following: Jeffrey Whited (‘Jeffrey’) testified that he is Whited’s uncle and that on May 19, 2005, he visited with Whited at approximately 6:30 p.m. at Jeffrey’s mother’s house in Oneonta. Jeffrey stated that he remembered visiting with Whited on that date because he wrote it down in his journal, which, he said, he keeps for work. Jeffrey stated that Whited was at the house when he arrived and that Whited told Jeffrey that his back hurt. According to Jeffrey, Whited ‘looked rough.’ Jeffrey stated that he stayed at the house until approximately 9:00 p.m. and that Whited did not leave.
“Deputy Sue Ashworth testified that she investigates sexual crimes for the Blount County Sheriffs Office. Ash-worth testified that on May 26, 2005, she went to M.H.’s father’s apartment, because she had received a complaint from Robertson about possible sexual abuse. Deputy Ashworth stated that on May 26, 2005, M.H. stated that ‘her father had put his penis in her butt’ and that Whited and another person were involved as well. Deputy Ashworth also testified, however, that M.H. stated that she could not see their faces. Deputy Ashworth testified that during the interview she did not notice any marks on M.H. to indicate physical abuse. According to Deputy Ashworth, M.H., during a videotaped interview, stated that she was ‘penetrated vaginally’ by both her father and Whited. Deputy Ashworth testified that, at some point, she executed a search warrant on M.H.’s father’s apartment and seized sheets, bedding, toothbrushes, and a massager for the purpose of having those items tested at the Department of Forensic Sciences (‘DFS’). Deputy Ashworth testified that she received a report from DFS indicating that they were unable to locate any DNA evidence on the items. Deputy Ashworth further testified that M.H. received'a medical examination that indicated that she had contracted ureaplas- *73 ma urealyticum — a sexually transmitted disease. Deputy Ashworth stated that Whited was tested for the sexually transmitted disease and that his test result was negative. Deputy Ashworth testified, however, that Edward Dunn tested positive for ureaplasma urealyti-cum. Deputy Ashworth stated that, in July 2005, she interviewed "Whited and Whited denied any involvement with the offense.
“On cross-examination, Deputy Ash-worth stated that M.H. told her that, before May 19, 2005, M.H. had been molested by her father for a long period and, on those occasions, would scream for her father to stop.
“Brad Sims, a child-abuse-and-neglect investigator for the Department of Human Resources, testified that he and Deputy Ashworth met with M.H. in May 2005. According to Sims, M.H. did not tell them what occurred on May 19, 2005, but only stated that she had been molested by her father. Sims stated that at that time there was no indication that anyone but M.H.’s father was involved. Sims testified that on June 15, 2005, he and Deputy Ashworth again met with M.H. and that, during that meeting, M.H. for the first time mentioned both Whited and Dunn. When confronted with his report of that meeting, however, Sims agreed that the report did not mention Whited or Dunn and stated only that ‘[M.H.] told us again that she had been molested by her father. She indicated that he had anal sex with her in the bedroom they shared.’
“On cross-examination, Sims testified that he had investigated Whited in February 2005, because M.H. had alleged that "Whited had come to her father’s apartment and kissed her on the neck and also mentioned to M.H. that he had been having dreams about engaging in sexual intercourse with her. Sims stated that, although Whited did not deny going to the apartment, he denied any wrongdoing. Sims conceded that no charges were brought against Whited arising out of the events that M.H. alleged occurred in February 2005.
“Huían Whited (‘Huían’), Whited’s father, testified that on May 19, 2005, he and Whited were
‘“over at Mr. Owen’s house. His lawnmower had broke down with him. He had to get a part for it — had to go to Cleveland. We had to mow Ms. Turley’s yard. We worked on it until noon and got us a sandwich and went over there and mowed her yard. [Whited] hurt his back. We got home and he was in the bed a week.’
“Huían further testified that on May 19, 2005, Jeffrey came over to the house at approximately 6:00 p.m. and remained at the house until approximately 9:30 p.m. According to Huían, Whited was at the house the entire evening because Whited hurt his back and was unable to leave.
“Daniel Stidham testified that in May 2005 he was employed by Mutual Savings Life Insurance and that Whited was one of his customers. According to Stidham, on May 19, 2005, he
“ ‘and his sales manager [were] working Springville Boulevard. That was his first week of employment. ■ We had went down to Glenda Torbert’s on Woodard Road, and as we were coming back up, as we approached Ms. Turley’s driveway and the edge of her lawn here, my sales manager had me to slow down and stop. He waved at [Whited] and his father.’
“Stidham testified that he did not know who Whited was at the time and was only able to recall that he saw Whited on *74 ■May 19, 2005, because he had a ‘copy of [his] mandate,’ which he kept for work.
“Whited testified in his own behalf, and; although he conceded that he knew M.H., he denied that he had anything to do with the events of May 19, 2005. Whited stated that he knew M.H.’s father because they had gone to school together and that in February 2005 he was going to work and noticed that the hood on M.II.’s father’s car was raised. Whited stated that he' then went over to M.H.’s father’s apartment to see if he needed a ride to work. Whited stated that M.H. answered the door and indicated that her father was not home. According to Whited, he never entered the apartment and, after M.H. stated that her father was not home, he left the apartment and never returned. ■
“Whited stated that on May 19,, 2005, he was working with his father and his great uncle, Cecil Owen. According to Whited, they repaired a lawnmower that morning and around 12:00 p.m. went to Ms. Turley’s home to cut her lawn. Whited stated that it took approximately two and a half hours to cut Ms. Turley’s lawn and they left Ms. Turley’s home at approximately 3:00 p.m. Whited stated that, at some point that day, he strained a muscle in his back ‘around where [he] had surgery.’ Whited further testified that he did not have any sexually transmitted diseases.”
Whited, 180 So.3d at 52-55 (footnote and references to record omitted).
At the close of all the evidence, Whited again moved the trial court for a judgment of acquittal, which the trial court denied. The State then presented a lengthy and impassioned closing argument. Jerome Colley, Whited’s attorney, waived his closing argument. The jury returned a verdict finding Whited' guilty of first-degree sodomy. On August 31, 2009, Whited moved for a new trial. On October 5, 2009, the trial court set a sentencing date for November 19, 2009. On November 19, the trial court sentenced Whited to 35 years in the penitentiary. On that date, the trial court also deferred ruling on the motion for a new trial until after sentencing and granted permission to Whited’s new attorney, Walter Kennedy III, to amend the posttrial motion for a new trial within 30 days after the imposition of sentence.
On December 14, 2009, Whited filed an amended motion for a new trial raising numerous ineffective-assistance-of-counsel claims, including the claim that his counsel was ineffective in waiving the right to make a closing argument on behalf of Whited. Following a continuance by agreement of the parties, see Rule 24.4, Ala. R.Crim. P., the trial court, on January 28,- 2010, conducted a hearing on Whited’s motion. On February 16, 2010, the trial court denied Whited’s motion for a new trial and made the following entry on the case-action-summary sheet: “The court having considered testimony of witnesses and argument of counsel, [Whited’s] motion for [a] new trial is hereby denied.”
Whited argued on appeal to the Court of Criminal Appeals that the trial court erred in denying his motion for a new trial based on his ineffective-assistance-of-counsel claim. Specifically, Whited argued, among other things, that his trial counsel was ineffective because he failed to make a closing argument on Whited’s behalf. The Court of Criminal Appeals addressed .the issue as follows:
“In addressing Whited’s contention in his motion for a new trial that counsel rendered ineffective assistance by waiving closing argument, the circuit made the following findings of fact:
“ ‘[T]he Court finds that counsel for [Whited] did in fact waive the right to *75 offer a closing argument to the jury. During the hearing on the motion for a new trial, trial counsel for [Whited] stated it was .trial strategy in not offering a closing and to prevent the prosecution from further commenting on [Whited’s] conduct.
“‘It is this Court’s understanding that the law requires the Court give deference to trial counsel’s decisions and strategic choices. And it is the Court’s opinion that the waiver of a closing argument did not affect the outcome of the verdict. ' As such, the Court does not find that counsel’s conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result. And the Court does not find that [counsel’s failure to make a closing argument] warrants setting aside the judgment of the jury and granting a new trial.’
“The record indicates that, at the hearing on Whited’s motion for new trial, trial counsel testified that his decision to waive closing argument was trial strategy. When asked specific questions regarding his strategic decisions, however, trial counsel testified that his recollection of the events surrounding Whited’s case was diminished based on the sudden death of his wife less than two months after Whited’s trial. Trial counsel testified that he could not recall when he made" the decision to waive his closing argument but statéd generally that the decision whether to have a closing argument is ‘pari; of the attorney’s strategy.’
“‘“If the record is silent as to the reasoning behind counsel’s actions, the presumption of effectiveness is sufficient to deny relief on [an] ineffective assistance of counsel claim.” ’ Davis v. State, 9 So.3d 539, 546 (Ala.Crim.App.2008) (quoting Howard v. State, 239 S.W.3d 359, 367 (Tex.Crim.App.2007)).
“ ‘ “ ‘An. ambiguous or silent record is not sufficient to disprove the strong and continuing presumption [of effective representation]. Therefore “where the. record is incomplete or unclear about [counsel]’s actions, we ■will presume that he did what he should have done, and that he exercised reasonable professional judgment.” ’ Chandler v. United States, 218 F.3d 1305, 1314 n. 15 (11th Cir.2000) (en banc)(quoting Williams v. Head, 185 F.3d 1223, 1228 (11th Cir.1999)).’” .
“Davis, 9 So.3d at 546 (quoting Grayson v. Thompson, 257 F.3d 1194, 1218 (11th Cir.2001)). Trial counsel’s inability to recall the basis of his strategic decision to' waive closing argument in this case limits this Court’s ability to review counsel’s representation at trial.
“Not only are we limited in our review by trial counsel’s inability to recall the basis of his strategic choice to waive closing argument, "we are also limited in our review by the United States Supreme Court’s holding in Strickland v. Washington, 466 U.S. 668 (1984). «In Strickland, the United States Supreme Court cautioned that a court must indulge a ‘strong presumption’ that counsel’s conduct falls within the wide range of reasonable professional assistance because it is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight. 466 U.S. at 689. Furthermore, ‘it is not" our function to second-guess1 the -strategic decisions made by counsel.’ Smith v. State, 756 So.2d 892, 910 (Ala.Crim.App.1997), aff'd, 756 So.2d 957 (Ala.2000). Indeed, a review of the prosecutor’s closing argument indicates that the prosecutor made an emotional plea to the jury that included general statements about the hid *76 eous nature of the offenses of which Whited had been charged and the plight of the victim following the incident. It is possible that trial counsel made a strategic choice to waive closing argument in order to prevent the prosecutor from returning on rebuttal and going into specific detail regarding the evidence presented at trial. It is this type of decision that the Supreme Court contemplated in Strickland when it recognized the presumption in favor of a finding of. reasonable professional assistance when the challenged action ‘might be considered sound trial strategy.’ 466 U.S. at 689.
“It is well settled that a trial counsel’s decision to waive closing argument is not, in itself, ineffective assistance of counsel. See Young v. State, 887 So.2d 820 (Ala.Crim.App.2004) ....
“Although Whited makes a compelling argument that his trial’ counsel exercised poor judgment in waiving closing argument, Whited failed to ‘affirmatively prove prejudice’ and ‘show that there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different.’ Strickland, 466 U.S. at 694. ‘The prejudice prong of the Strickland test requires a showing, that a different outcome of the trial probably would have resulted but for counsel’s allegedly ineffective performance.’ Worthington v. State, 652 So.2d 790, 796 (Ala.Crim.App.1994)(intemal citations omitted). Whited has not .made such a showing in this case. Accordingly, the circuit court did not abuse its discretion in denying Whited’s motion for .a new trial on the basis that he received ineffective assistance of counsel based on counsel’s waiver of closing argument.”
Whited, 180 So.3d at 60-62.
Judge Joiner- dissented from the main opinion, stating that he did not “agree that Whited’s trial counsel’s actions were within the ‘wide range of professionally competent assistance’ when he waived closing argument, see Strickland, 466 U.S. at 689, abandoning ‘the last clear chance to per-' suade the [jury] that there may be reasonable doubt of [Whited’s] guilt.’ Herring [v. New York, 422 U.S. 858 (1975)].” Whited, 180 So.3d at 68. Judge Joiner further concluded that, under the circumstances of this case, Whited was prejudiced by trial counsel’s failure to make a closing argument. Whited, 180 ,So.3d at 68.

Discussion

.Whited argues that the Court of Criminal Appeals erred in evaluating whether his trial counsel’s performance was deficient under Strickland because, he says, that court failed to adequately consider all the circumstances that existed at the time his trial counsel waived Whited’s right to a closing argument. Whited contends (1) that the Court of Criminal Appeals’ conclusion that his trial counsel’s decision to waive closing argument was based on “trial strategy” is not supported by the record, (2) that the Court of Criminal Appeals did not fully consider the effect of the waiver of closing argument , in light of the prosecutor’s closing statement, and (3) that the Court of Criminal Appeals failed to consider the strong arguments against guilt that were available to Whited.
The Court of Criminal Appeals aptly set forth the applicable law: •
“ ““ “It is well established that a ruling on a motion for a new trial rests within the sound discretion of the trial judge. The exercise of that discretion carries with it a presumption of correctness, which will not be disturbed by this Court unless some legal right is abused and the record plainly and *77 palpably shows the trial judge to be in error.” ’ ” Hosea 0. Weaver & Sons, Inc. v. Towner, 663 So.2d 892, 895 (Ala.1995) (quoting Kane v. Edward J. Woerner & Sons, Inc., 543 So.2d 693, 694 (Ala.1989), quoting in turn Hill v. Sherwood, 488 So.2d 1357 (Ala.1986)).’
“Ex parte Hall, 863 So.2d 1079, 1081-82 (Ala.2003).
“““In order to prevail on a claim of ineffective assistance of counsel, a defendant must meet the two-pronged test articulated by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984):
“ ““ “First, the defendant must show that counsel’s performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the ‘counsel’ guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel’s errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.”
“““466 U.S. at 687, 104 S.Ct. at 2064.
“ ““ “The performance component outlined in Strickland is an objective one: that is, whether counsel’s assistance, judged under ‘prevailing professional norms,’ was ‘reasonable considering all the circumstances.’ ” ' Daniels v. State, 650 So.2d 544, 552 (Ala.Cr.App.1994), cert., denied, [514 U.S. 1024, 115 S.Ct. 1375, 131 L.Ed.2d 230 (1995) ], quoting Strickland, 466 U.S. at 688, 104 S.Ct. at 2065. “A court deciding an actual ineffectiveness claim must judge the reasonableness of counsel’s challenged conduct on the facts of the particular case, viewed as of the time of counsel’s conduct.” Strickland, 466 U.S. at 690, 104 S.Ct. at 2066.
“““The claimant alleging ineffective assistance of counsel has the burden of showing that counsel’s assistance was ineffective. Ex parte Baldwin, 456 So.2d 129 (Ala.1984), aff'd, 472 U.S. 372, 105 S.Ct. 2727, 86 L.Ed.2d 300 (1985). “Once a petitioner has identified the specific acts or omissions that he alleges were not the result of reasonable professional judgment on counsel’s part, the court must determine whether those acts or omissions fall ‘outside the wide range of professionally competent assistance.’ [Strickland,] 466 U.S. at 690, 104 S.Ct. at 2066.” Daniels, 650 So.2d at 552. When reviewing a claim of ineffective assistance of counsel, this court indulges a strong presumption that counsel’s conduct was appropriate and reasonable. Hallford v. State, 629 So.2d 6 (Ala.Cr.App.1992), cert. denied, 511 U.S. 1100, 114 S.Ct. 1870, 128 L.Ed.2d 491 (1994); Luke v. State, 484 So.2d 531 (Ala.Cr.App.1985). “This court must avoid using ‘hindsight’ to evaluate the performance of counsel. We must evaluate all the circumstances surrounding the case at the time of counsel’s actions before determining whether counsel rendered ineffective assistance.” Hall-ford, 629 So.2d at 9. See also, e.g., *78 Cartwright v. State, 645 So.2d 326 (Ala.Cr.App.1994).
“““ “Judicial scrutiny of counsel’s performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel’s assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel’s defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreásonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel’s challenged conduct, and to evaluate the conduct from counsel’s perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel’s conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action ‘might be considered sound trial strategy.’ There are countless ways to provide effective assistance-in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.”
“ ‘ “ ‘Strickland, 466 U.S. at 689, 104 S.Ct. at 2065 (citations omitted). See Ex parte Lawley, 512 So.2d 1370, 1372 (Ala.1987).
“‘“‘“Even if an attorney’s performance is determined to be deficient, the petitioner is not entitled to relief unless he establishes that ‘there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.’ [Strickland,] 466 U.S. at 694, 104 S.Ct. at 2068.”
“ ‘ “ ‘Daniels, 650 So.2d at 552.’ ”
“ ‘Dobyne v. State, 805 So.2d 733, 742-43 (Ala.Crim.App,2000), aff'd, 805 So.2d 763 (Ala.2001). See also Nicks v. State, 783 So.2d 895, 918-919 (Ala.Crim.App.1999).’
“Sheffield v. State, 87 So.3d 607, 633-35 (Ala.Crim.App.2010).”
Whited, 180 So.3d at 56-57.
It is welT settled'that a trial counsel’s decision to waive a closing argument on behalf of his or her client does not alone constitute ineffective assistance of counsel. Young v. State, 887 So,2d 320 (Ala.Crim.App.2004); Lawhorn v. State, 756 So.2d 971 (Ala.Crim.App.1999); and Floyd v. State, 571 So.2d 1221 (Ala.Crim. App.1989), rev’d on other grounds, Ex parte Floyd, 571 So.2d 1234 (Ala.1990). However, the importance of a closing argument cannot be understated:
“It can hardly be questioned that closing argument serves to sharpen and clarify the issues for resolution by the trier of fact in a criminal case. For it is only after all the- evidence is in that counsel for the parties are in a position to present their respective versions of the case as a whole. Only then can they argue the inferences to be drawn from all the testimony, and point out the weaknesses' of their adversaries’ positions. And for the defense, closing argument is - the last clear chance to persuade the trier of fact that there may be reasonable doubt of the defendant’s guilt. See In re Winship, 397 U.S. 358 [(1970)].
“The very premise of our adversary system of criminal justice is that parti *79 san advocacy on both sides of a case will . best promote the ultimate objective that the guilty be convicted and the innocent go free. In a criminal trial, which is in the end basically a factfinding process, no aspect of such advocacy could be more important than the opportunity finally to marshal the evidence for each side before submission of the case to ■judgment.”
Herring v. New York, 422 U.S. 853, 862, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975).
The Court of Criminal Appeals surmised that one “possible” strategic reason for trial counsel’s waiver of closing argument in this case was “to prevent the prosecutor from returning on rebuttal and going into specific detail regarding the evidence presented at trial.” Whited, 180 So.3d at 65. Preventing the State from returning on rebuttal to make a closing argument has been upheld as a strategic decision that alone does not render counsel’s performance ineffective. See Floyd, supra, and Lawhorn, supra. In Floyd, the defendant claimed that his trial counsel had been ineffective when trial, counsel waived closing argument. The trial court addressed the defendant’s- ineffective-assistance-of-counsel claim as follows:
“[Floyd’s] second allegation of ineffective assistance is that his trial lawyer waived closing argumefit at the guilt stage. [Trial counsel] did waive his closing argument pursuant to a strategic decision.
“[Trial counsel] based his decision to waive closing argument on two factors. First, [trial counsel] had no strong arguments available to dissuade, the jury from convicting his client or to persuade [it] to find petitioner guilty of a lesser offense. Second, the prosecution’s initial closing argument was very brief and it appeared that the prosecution was saving its persuasive argument for last. [Floyd’s trial counsel] thought the. potential harm to his client from the prosecution’s second closing argument outweighed any benefit to be obtained from [trial counsel’s] argument. [Floyd’s trial counsel] had made the same decision in other cases with some success.”
571 So.2d at 1227. The Court of Criminal Appeals held in Floyd as follows:
“The testimony of [Floyd’s] trial counsel established that he made a strategic decision to forgo his closing argument in order to deprive the prosecution of its main opportunity to argue its case to the jury. The uncontradicted testimony of trial -counsel was that the prosecutor’s initial closing argument had been quite brief and had consisted of little more than a reading of the indictment. In light of this, Floyd’s trial counsel decided that because he had no persuasive arguments,, his client’s interest could best be served by denying the prosecution, who had the burden of proof, of its chance to argue how that burden had been..met. This is exactly the sort of strategic decision which the United States Supreme Court has held to be virtually unchallengeable in Strickland v. Washington, 466 U.S. at 690, 104 S,Ct. at 2065. Furthermore, Floyd did not even suggest a manner-in which his trial counsel could have argued in closing that would have affected the outcome of his trial. Thus, Floyd has failed to establish a reasonable probability that, but for his lawyer’s waiving his guilt-stage closing argument, the outcome of his trial would have been different. Therefore, the circuit court’s findings were correct.”
571 So.2d at 1227.
In Lawhorn, the defendant in a death-penalty case argued in a Rule 32, Ala. R.Crim. P., postconviction petition that his trial counsel was ineffective for failing to *80 make a closing argument during the penalty phase of his trial. The trial court addressed the issue as follows:
“‘At the Rule 32[, Ala. R.Crim. P.,] hearing, [Lawhorn’s trial counsel] testified that he made a strategic decision that he would not make a closing argument during the penalty phase of the trial. It was [trial counsel’s] understanding that if he waived closing argument that the district attorney would not be allowed to argue. [Trial counsel] did not want to give the district attorney an opportunity on rebuttal to get up and point at Lawhom and call him a coldblooded murderer and back-shooter. [Trial counsel] wanted to prevent the district attorney from inflaming the minds of the jury.
[[Image here]]
“ ‘Trial counsel’s decision to waive his closing argument did not render his performance deficient because it was a strategic decision to keep the district attorney from making a closing argument. This Court has watched district attorney Rumsey on many occasions during closing argument. He is powerful and effective during closing argument. Based on this Court’s experience, it is not an unusual tactical decision in Talladega County for attorneys to waive closing argument to prevent district attorney Rumsey from making a closing argument. ...’”
Lawhorn, 756 So.2d at 987. The Court of Criminal Appeals addressed the issue in Lawhorn as follows:
“[W]e [have] held that it was not ineffective assistance of counsel when defense counsel made a strategic decision to waive closing arguments in order to deprive the prosecution of its main opportunity to argue to the jury. Similar to the situation in Floyd, Lawhorn’s trial counsel did not offer closing argument in an attempt to deprive the prosecution of labeling Lawhorn a ‘cold-blooded murderer and a back-shooter.’ ‘This is exactly the sort of strategic decision which the United States Supreme Court has held to be virtually unchallengeable in Strickland v. Washington, 466 U.S. at 690, 104 S.Ct. at 2065.’ Floyd, 571 So.2d at 1227. We agree with the trial court that in this situation with these particular facts, closing argument by defense counsel would have had little impact.”
756 So.2d at 987.
Thus, in disposing of the waiver-of-closing-argument issue in the context of an ineffective-assistance-of-counsel claim in Floyd and Lawhom, the Court of Criminal Appeals took into consideration whether trial counsel could articulate a strategic reason for waiving the argument, the strength or persuasiveness of the defendant’s arguments against guilt, and the nature of the State’s closing argument.

The “Trial-Strategy Finding”

Whited first contends that the Court of Criminal Appeals “should have, at best, given no weight” to trial counsel’s testimony that the decision to waive closing argument was based on “trial strategy,” because, he says, nothing in the record indicates that the decision to waive closing argument was based on “trial strategy.” As quoted above,, the trial court found that Whited’s trial counsel stated that “ ‘it was trial strategy in not offering a .closing and to prevent the prosecution from further commenting on [Whited’s] conduct.’ ” Whited, 180 So.3d at 60.
At the hearing on the motion for a new trial, Whited’s trial counsel testified that his recollection of the events surrounding Whited’s trial was diminished as a result of the sudden death of his wife less than two months following the trial. When questioned by Whited’s appellate counsel, *81 Whited’s trial counsel repeatedly stated that he did not recall much about the trial. Whited’s trial counsel testified that he did not recall when he decided to waive closing argument and that he did not recall discussing with Whited the decision to waive closing argument. Although Whited’s trial counsel did not recall specifics about the decision to waive Whited’s right to closing argument at trial, he stated generally that the decision whether to present a closing argument is part of the attorney’s trial strategy and is dependent upon the information elicited during the trial.
Although Whited’s trial counsel testified that he could not recall the specifics surrounding his decision to waive closing argument, the record indicates that he was able to recall other aspects of the case. For example, Whited’s trial counsel testified that his overall strategy was to continue this case from trial docket to trial docket until the victim turned, of age and “disappeared.”[1] However, Whited’s trial counsel testified that, when it became apparent that this case would proceed to trial, he developed a new strategy. Whited’s trial counsel explained at length that his defense strategy was to present an alibi for Whited at the time of the assault through the testimony of family and friends. He also testified that Whited’s uncle had a document that would have supported the alibi. Whited’s trial counsel further testified that his strategy included attempting to impeach the victim’s testimony, including whether the victim could actually identify the person or persons who had assaulted her.
Whited testified during the hearing on the motion for a new trial that his trial counsel informed him during a recess immediately before closing arguments were to begin that he was not going to present a closing argument. Whited stated that he responded by stating that he did not know what a closing argument was but implored his trial counsel to “do what you are supposed to do for me.” Whited’s trial counsel testified that his practice was to discuss each phase of the trial process with his clients and that he would have discussed the issue of waiving closing argument with Whited before closing arguments began. Whited’s trial counsel candidly admitted during the hearing that, at the time he would have had the conversation with Whited regarding waiving closing argument, he could not have known what the prosecutor would initially argue in the State’s closing argument.
 A review of the record in this case indicates that Whited’s trial counsel was unable to provide a specific reason for waiving closing argument. When questioned on the issue, Whited’s trial counsel was unable to recall specifics about the decision to waive closing argument, such as when the decision to waive closing argument was actually made. Whited’s trial counsel stated only in general terms that whether to waive closing argument would be part of the attorney’s trial strategy based on the information elicited at trial. Whited’s trial counsel did not testify, as the trial court found, that his decision to waive closing argument was trial strategy designed to prevent the prosecution from further commenting on Whited’s conduct. We further note that Whited’s trial counsel informed him before closing arguments began that he would not make a closing argument. Because Whited’s trial counsel had decided to waive closing argument before closing arguments had began, it was not possible for his trial counsel to *82 make a fully informed “strategic decision” regarding the waiver of closing argument without first having heard the complete content and extent of the State’s initial closing argument. Accordingly, after reviewing the record in this case, we conclude that it does, not support the trial court’s finding that trial counsel’s waiver of closing argument was a strategic decision with the.goal of preventing the prosecution from further commenting on Whited’s conduct during rebuttal.[2] The failure of Whited’s trial counsel to articulate a “strategic” reason for waiving closing argument distinguishes this case from both Floyd and Lawhorn .

Arguments Against Guilt

Whited next argues that the Court of Criminal Appeals failed to take into consideration the “ ‘strong arguments available to dissuade the jury from convicting’ ” him. Whited, 180 So.3d at 66 (Joiner, J., dissenting)(quoting Floyd, 571 So.2d at 1227). The State’s case lacked any physical or forensic evidence linking Whited to the crime. Whited also had tested negative for a sexually transmitted disease for which both the victim and an alleged co-assailant — Dunn—had tested positive. The State’s case essentially turned upon the testimony of the victim.
Danny Robertson, the victim’s next-door neighbor, testified at tidal that on the evening of May 19, 2005, between 6:00 p.m. and 7:00 p.m., he could hear voices coming from the apartment where the victim lived. He .testified that he heard the victim saying “Stop. Don’t. No more, please” and that he could also hear her “crying — weeping on the floor.” Robertson further testified that, in addition to the victim’s voice, he could hear three male voices coming from the apartment. Robertson testified that there had been “[q]uite a few” incidents similar to this and that on those occasions he would see Whited at the apartment. Robertson reported what he had heard to the Blount County Sheriffs Office the following morning.
On cross-examination Robertson admitted that he had previously testified at the trial of codefendant Edward Dunn in October 2008 that he had heard the voices 'coming from the apartment between 5:30 p.m. and 6:00 p.m. Robertson further admitted that he had previously testified that the events happened in “early fall” when “it 'was cold” despite it being undisputed that the events made the basis of this case occurred in May. Robertson also testified that the events occurred at “dusk ... between daylight and dark.” The victim contradicted Robertson’s testimony in that she testified that there was no light shining through her bedroom window at the time of the incident because it was dark outside.
The only direct evidence establishing Whited’s guilt was the testimony of the victim indicating that Whited, Dunn, and her father entered- her bedroom; ■ that Whited “grabbed [her] by the leg and he *83 pulled [her] long ways on [her] bed over to [her] dad’s bed”; that Whited “took [her] panties off’ and “got on-top, of [her] and then he stuck his penis in [her] back side and then somebody took an electric toothbrush and he stuck it inside [her]”; that Whited “got off [her] and someone else got on [her]”; and that Whited threatened to kill her if she told anyone. This testimony was qualified, however, by the victim’s testimony that the bedroom was dark and that she could not see her attackers’ faces. We further note that the victim testified that she did not know if any of the three men — Whited, Dunn, or her father — present in the apartment when she came-home from sehool had left or if any additional men had entered the apartment after she retired to her bedroom during the intervening period between her entering -the apartment after school and the attack later in the evening.
The victim did not initially report the attack to anyone. As stated above, Rob-: ertson reported what he had heard in the adjoining apartment to the authorities the morning after the incident. Investigator Brad Sims testified that during the initial interview, with the victim on May 26, 2005, she did not initially name Whited as one of her attackers and did not indicate that anyone other than her father was involved in the attack. On June 15,2005,, the victim was again interviewed by Sims and Deputy Sue Ashworth. Sims testified that at this interview the victim mentioned Whited and Dunn for the first time. - However, the report generated following the interview did not mention Whited or Dunn and stated only that her father had molested her.
The victim testified at trial that Whited had penetrated her vagina' with his penis. However, on June 20, 2015, the victim was examined by Dr. Earl Stradtman and during this examination she specifically denied that she had been penetrated vaginally. Dr. Stradtman’s physical examination of the victim revealed no sign of injury to the outer structures of the vagina or the hymen.
Whited also presented evidence that he had ah alibi for the period when the attack occurred. Jeffrey Whited, Whited’s uncle, testified that he maintains a journal for work purposes in which he stated that he “logged everything down.” Jeffrey testified that the journal entry for May 19, 2005, indicated that he, spoke with Whited at Jeffrey’s mother’s residence[3] for about 10 minutes between 6:30 p.m. and 7:00 p.m. regarding a job for Jeffrey’s son mowing grass. Jeffrey testified that Whited complained about his back hurting and that Whited looked “rough.” Jeffrey stated that he remained at his mother’s residence till approximately 9:00 p.m. and that Whited did not leave during that time.
Huían Whited, Whited’s father, testified that on May 19, 2005, he and Whited mowed “Mrs. Turley’s” yard and that Whited injured' his back while doing so, which, according to Huían, left Whited “in the bed a week.” Huían confirmed that Jeffrey came over to the house at approximately 6:00 p.m. on May 19, 2005, and remained at the house until approximately 9:30 p.m. According to Huían, Whited remained at the house the entire evening of May 19, 2005, because he was unable to leave due to his back injury.
Daniel Stidham testified that in May 2005 he was- employed by Mutual Savings Life Insurance and that Whited was one of his customers. Stidham testified that on May 19, 2005, he and his sales manager saw Whited arid his father at “Ms. Tur-ley’s.”,
*84 Stidham testified that he was able to recall that he saw Whited on May 19, 2005, because he had a “copy of [his] mandate,” which he kept for work.
It appears from the record that Whited had several potentially strong arguments available to him that could have been presented to the jury in a closing argument. The State’s case lacked any physical or forensic evidence linking Whited to the crime. Whited had tested negative for a sexually transmitted disease that both the victim and codefendant Dunn had tested positive for. The victim’s graphic testimony describing the attack in her bedroom was qualified by the fact that the bedroom was dark and that she could not see her attackers’ faces. There were a number of inconsistencies in the evidence that could have been argued to the jury, including the testimony from investigator Sims that the victim did not initially name Whited as one of her attackers and the victim’s own testimony at trial that she was vaginally penetrated after having specifically denied being vaginally penetrated during Dr. Stradtman’s examination of her. Finally, Whited had presented evidence of an alibi that could have been argued to the jury. The existence of these seemingly strong arguments against guilt that were available to Whited and that could have been presented to the jury during a closing argument distinguishes this case from Floyd, supra.

The State’s Closing Argument

Whited next argues that the Court of Criminal Appeals failed to fully consider his trial counsel’s waiver of closing argument in light of the content of the State’s closing argument. The prosecutor stated to the jury during the State’s initial closing argument that “all the stuff you heard ... is not easy to hear” and that it “sure wasn’t easy for [the victim] to get up here and tell it to thirteen strangers.” The prosecutor then referenced other criminal activity that was unrelated to the case, stating:
“I flipped on the [television] this morning about five o’clock on Channel 13 and one of the first things I see on the news is where a convicted felon from another state was caught here in Alabama because he had molested and sodomized a thirteen year old girl in another state. I thought, ‘You can’t get away from it.’ It is not something even though we hear about it and we know in the back of our mind that it goes on, it is not something we like to think about or that it goes on in our society especially here in Blount County.”
The prosecutor further stated to the jury that she was a mother and that she disliked the “things that are going on ... out there.” She then informed the jury that she thought about how to “sugarcoat” the case, even praying for an answer, but then determined that “[i]t is what it is,” stating that “there is no easy way to sugarcoat it. It is ugly. It is nasty. It is repulsive.” The prosecutor stated that she came to the realization that the case could not be “sugarcoated” because no one had “sugarcoated” it for the victim. She explained:
“When [the victim] was thirteen years old,[4] she lived here at - Godfrey Drive with her dad. That was her home. She was supposed to be safe in that home. She was supposed to be able to go to bed at night, get a good night’s sleep at thirteen years old and get up and go to school the next morning and *85 not have a care in the world. She is thirteen years old ... When I was thirteen, I didn’t have a worry in the world. My parents saw to that. [The victim] didn’t have that privilege and that luxury. When she was thirteen years old, nothing was sugarcoated especially on that night back in May of 2005 when these people entered her bedroom — the sanctity of her bedroom where she slept. When they came into her bedroom, they didn’t sugarcoat anything for [the victim] — nothing. Those three men — that man included — did what they wanted to without thinking anything about [the victim]. They didn’t care what happened or what happened afterwards. They did what they wanted to do. [The victim] was there alone in her bed. She had nobody to protect her. We have already established that her mother was nowhere to be found. She even lived in some other county. There was nobody. One of these three men was a man she trusted. She trusted him to take care of her. What does he do? He went in there with them. You heard the testimony. It wasn’t sugarcoated. As harsh and abrasive as it may be for us to talk about, I think we had to do that. We had to hear those words. I’m sorry you. had to go through it. It was something we had to do to make you understand her story.”
The prosecutor told the jury how “painful” and “humiliating” it was for the victim to get on the witness stand and to relive the events of May 19, 2005. The prosecutor then referred to the victim as “my hero” for choosing to come to court to testify and to relive the events when she did not have to. The prosecutor told the jury that Whited had “humiliat[ed] [the victim], beat[en] [the victim], [and] hit [the victim] when she tried to get up” and that “when he finished doing what he did to her” he said, in a whisper, “[i]f you tell anybody, I’m going to kill you.” The prosecutor, while crying, closed her statement to the jury stating:
“(Crying) I would ask that when you go back — I’m so sorry. I was not going to do this. When you go back in there, just remember it is what it is. And what it is — is ugly. What that man did to that child is a crime.”
Judge Joiner correctly stated in his dissent that the prosecutor’s initial closing argument “can neither be characterized as ‘very brief,’ nor does ‘it appearf ] that the prosecution was saving its persuasive argument for last.’ Floyd, [571 So.2d at 1227].” Whited, 180 So.3d at 68 (Joiner, J., dissenting). Instead, he described the prosecutor’s initial closing argument as “lengthy, persuasive, and emotional,” Whited, 180 So.3d at 67 (Joiner, J., dissenting), and in that regard this case is further distinguishable from Floyd, supra, and Lawhom, supra.
As stated above, the Court of Criminal Appeals concluded that one “possible” strategic decision for trial counsel’s waiving closing argument in this case was to “prevent the prosecutor from returning on rebuttal and going into specific detail regarding the evidence presented at trial.” Whited, 180 So.3d at 61. We must question what “specific detail regarding the evidence” was left for the prosecutor to delve into on rebuttal. The only direct evidence linking Whited to the crime was the victim’s testimony, which she gave in graphic detail during the trial and which the prosecutor characterized in her initial closing argument as describing an offense that was “ugly,” “repulsive,” and “nasty.” The prosecutor told the jury that Whited “humiliated” and “beat” the victim while sodomizing her and that when he was done “doing what he did to her” he threatened to kill her if she told anyone. The prose *86 cutor described the sad circumstances of the victim’s home life and the fact that she had no one to protect her as she lie alone in her bed as the three men, including her own father, entered the bedroom to sodomize her. The prosecutor further told the jury how humiliating and painful it was for the victim to relive the events by testifying as to those events in court and how the victim was her “hero” for doing so when she did not have to. Finally, the prosecutor referenced other criminal activity unrelated to this case in which an assailant had molested and sodomized a 13-year-old girl.
When Whited’s trial counsel chose to waive closing argument in this case, he forfeited Whited’s last chance to “marshal the evidence” in his favor by presenting to the jury the rather strong arguments available to Whited from which the jury could determine the relative weaknesses of the State’s ease and from which the jury could conclude that “there may be reasonable doubt of [Whited’s] guilt.” See Herring, 422 U.S. at 862. As is the case here, “when Whited’s tidal counsel waived his closing argument, he left the jury with only the tearful, emotional[, and persuasive] plea of the prosecutor to find Whited guilty of first-degree sodomy.” Whited, 180 So.3d at 68 (Joiner, J., dissenting).
After evaluating “all the circumstances surrounding the case at the time of [Whited’s] counsel’s actions,” Strickland, 466 U.S. at 689, including Whited’s trial counsel’s inability to provide a strategic reason for- waiving closing argument; the seemingly strong arguments available to Whited from which the jury could possibly conclude that, reasonable doubt existed as-to Whited’s guilt; and the length and highly emotional nature of the State’s initial closing argument, we conclude that trial counsel’s decision to waive closing argument was an-“error[] so serious that counsel was not functioning as the ‘counsel’ guaranteed the defendant by the Sixth Amendment” and that the waiver of Whited’s closing was deficient under Strickland. Strickland, 466 U.S. at 689-. Thus, Whited has satisfied the first prong of Strickland.
We next, must determine whether Whited was prejudiced by his trial .counsel’s deficient performance in waiving his right to a closing argument. Strickland, supra. As discussed at length above, the State’s case against Whited lacked any physical evidence connecting Whited to the crime, there were ■ inconsistencies in the victim’s testimony, the victim and co-defendant Dunn tested positive for a sexually transmitted disease for which Whited tested negative, and Whited had a relatively strong alibi. By failing to make a closing argument on Whited’s behalf, Whited’s trial counsel lost the final opportunity to presént these arguments to the jury in order “to persuade5 the trier of fact that there may be reasonable doubt of [Whited’s] guilt.” Herring, 422 U.S. at- 862. We conclude that had these aspects of the case been presented to the jury in a closing argument “there is a reasonable probability that ... the result of the proceeding would have been-different.”[5] Strickland, 466 U.S. at 694. Thus, Whited has satisfied the second prong of Strickland.

Conclusion

Accordingly, we reverse the judgment of the Court of Criminal Appeals and remand *87 the case for that court to direct the trial court to grant Whited’s motion for a new trial.
REVERSED AND REMANDED.
STUART, MURDOCK, and BRYAN, JJ., concur.
MOORE, C.J., and PARKER and SHAW, JJ., dissent.
MAIN and WISE, JJ., recuse themselves.*

. Trial counsel was obviously referring to his thoughts that the victim would ultimately decide not to testify.

. We; note, as did the Court of Criminal Appeals, that an appellate court " ‘ " ‘indulges a strong presumption that counsel’s conduct was appropriate and reasonable,’ ” ’ " Sheffield v, State, 87 So.3d 60.7, 633-35 (Ala.Crim.App.2010) (quoting Dobyne v. State, 8Ó5 So.2d 733, 743 (Ala.Crim.App.2000), quoting other cases), and that where the “ ‘record is silent as to the reasoning behind counsel’s actions, the presumption of effectiveness is sufficient to deny relief on [an] ineffective assistance of counsel claim.’ ” Davis v. State, 9 So.3d 539, 546 (Ala.Crim.App.2008) (quoting Howard v. State, 239 S.W.3d 359, 367 (Tex.Crim.App.2007)). However, the effect of a silent record upon the presumption of effectiveness afforded Whited's trial counsel’s decision to waive closing in this particular case must be considered in light of Whited's trial counsel’s ability to recall at length that strategy as it pertained to Whited’s defense.

. Jeffrey stated that Whited lived at Jeffrey's mother’s house.

. The Court of Criminal Appeals stated that the victim was 14 years old. Apparently, although it is not clear from the record, the victim turned 14 around the time of the offense.

. We do not imply that the State’s evidence was insufficient to convict' Whited of first-degree sodomy. We conclude only- that, ■based on the circumstances’ present in this case, Whited was prejudiced under Strickland by his trial counsel’s failure to make a closing argument on his behalf.